IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Case No. 2:25-cr-122-JKW-DEM |
| | * | |
| LETITIA A. JAMES, | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \*

**ATTORNEY GENERAL LETITIA A. JAMES' MOTION TO ENFORCE
RULES PROHIBITING THE GOVERNMENT'S EXTRAJUDICIAL
DISCLOSURES AND STATEMENTS**

Attorney General Letitia A. James, by and through undersigned counsel, moves this Court for an Order requiring the government in this case to follow the Federal Rules of Criminal Procedure, the Code of Federal Regulations, the Local Rules of this District, various rules of ethical and professional responsibility, and the Department of Justice's Justice Manual in order to prevent future disclosures of investigative and case materials, as well as to prevent further extrajudicial statements to the media and public concerning this case and any parties or witnesses.

**FACTUAL BACKGROUND**

Over the past six months, as the federal government's investigation of Attorney General James unfolded in public view, several media outlets quoting sources familiar with or "briefed on the matter" have reported on the activity of prosecutors in front of grand juries in this District.[1]

---

[1] *See, e.g.*, Kara Scannell, *FBI director confirms federal probe into New York attorney general*, CNN (May 19, 2025), https://perma.cc/TR7B-6VGK; Jonah E. Bromwich, et al., *In Pursuing Trump Rival, Weaponization Czar Sidesteps Justice Dept. Norms*, N.Y. Times (Aug. 19, 2025), https://perma.cc/TEB9-ZK85; Kristen Holmes, et al., *DOJ struggles to build mortgage fraud case against Trump adversary Letitia James, sources tell CNN*, CNN (Sept. 17, 2025),

These articles included reports that prosecutors in the U.S. Attorney's Office for the Eastern District of Virginia intended to bring the charges filed in this case, and that they may add additional charges—disclosures and investigative information that would be known only by the government.[2] Although the government sought and filed the indictment in this case on October 9, 2025—signed only by purported interim U.S. Attorney Lindsey Halligan—articles issued before the charges were filed indicated that charges would be brought.[3]

What precipitates this motion now is a digital messaging exchange that occurred after the government brought charges, between purported interim U.S. Attorney Halligan and Anna Bower, a senior journalist for *Lawfare*, published on Monday, October 20, 2025.[4] The article and the texts between the two are attached as **Exhibits A** and **B**, respectively. As reported and as confirmed by the Signal messages exchanged between Ms. Halligan and Ms. Bower, it was Ms. Halligan who initiated contact with the journalist—an unusual and improper occurrence.

The exchange was a stunning disclosure of internal government information. On October 11, 2025—two days after charging Attorney General James with Bank Fraud and False Statements to a Financial Institution—Ms. Halligan reached out to Ms. Bower to claim she was "reporting

---

https://perma.cc/MP4J-8RHM; Glenn Thrush, et al., *U.S. Attorney Investigating Two Trump Foes Departs Amid Pressure From President*, N.Y. Times (Sept. 19, 2025), https://perma.cc/EV67-D7PB.

[2] Peter Charalambous, et al., *Trump officials pressuring federal prosecutors to bring criminal charges against NY AG Letitia James: Sources*, ABC News (Sept. 17, 2025), https://perma.cc/G4NY-SF9U; Sadie Gurman, et al., *Trump's Favored Prosecutor Is Moving at Full Steam*, Wall St. J. (Oct. 11, 2025), https://perma.cc/J7XT-2GTM; Alan Feuer, et al., *Prosecutor Who Rejected Trump's Pressure to Charge James Is Fired*, N.Y. Times (Oct. 17, 2025), https://perma.cc/FCK3-WTD7.

[3] Katherine Faulders, et al., *Trump poised to fire US attorney for resisting effort to charge NY AG Letitia James: Sources*, ABC News (Sept. 19, 2025), https://perma.cc/L5QJ-GTB4.

[4] Anna Bower, *"Anna, Lindsey Halligan Here."*, Lawfare (Oct. 20, 2025), https://perma.cc/9ZSC-ZRTQ (Exhibit A).

things that are simply not true" (Ex. B at 2), thus commenting on the evidence in the case and that which she likely learned as a result of grand jury testimony, documents subpoenaed by the grand jury, or a summary of the investigation which, in turn, relied on such information. Ms. Halligan was referring to (and prompted by) Ms. Bower's posts on the social media platform "*X*" earlier that day, which Ms. Halligan was attempting to refute:



(Ex. A at 6). Not long after that first post, Ms. Bower followed up with a second *X* post, stating: "This is important exculpatory evidence [because] the indictment accuses James of seeking a 'second home' mortgage when in reality she intended to use it as an 'investment' home by renting it." (*Id.* at 7).

After confirming Ms. Halligan's identity, Ms. Bower asked the purported interim U.S. Attorney what she was "getting wrong," and Ms. Halligan replied: "Honestly, so much. I can't tell

3

you everything but your reporting in particular is just way off. I had to let you know." (Ex. B at 3). Ms. Halligan then said Ms. Bower had jumped to "biased conclusions" based on the *New York Times*' reporting "instead of truly looking into the evidence." (*Id.* at 4). Ms. Halligan even stated, "you don't have sources that are accurately telling you what you're writing"—seemingly trying to cast herself as an accurate source and refute the reporting in the *New York Times*. (*Id.*).

The next portion of the exchange includes Ms. Halligan's stated annoyance that journalists reported on "exculpatory evidence" that undercut the charges that Ms. Halligan was ordered to bring against Attorney General James (and which President Trump demanded in a social media post). (*Id.* at 5). Ms. Halligan then added two additional extrajudicial statements: "Yes they did [get something wrong] but you went with it!"—referring to Ms. Bower commenting on and reposting the *New York Times*' reporting on *X*—and "they are disclosing grand jury info – which is also not a full representation of what happened"—referring to the *New York Times*' account of grand jury activity in Norfolk. (*Id.*). Later messages from Ms. Halligan directly cite evidence that must have been presented to the grand jury, as it was also referenced in the indictment: "It says she received thousand(s) of dollars in rent." (*Id.* at 7).

After several more exchanges, Ms. Bower wrote to Ms. Halligan to ask her to clarify what Ms. Halligan believed was "incorrect about the NY Times account or my summary of it." (*Id.* at 8). Ms. Halligan responded: "Anna, You're biased. Your reporting isn't accurate. *I'm the one handling the case* and I'm telling you that. If you want to twist and torture the facts to fit your narrative, there's nothing I can do. Waste to even give you a heads up." (*Id.* at 9) (emphasis added). Ms. Halligan did not explain why it was the job of a prosecutor to give a reporter "a heads up." Ms. Bower continued to ask for clarification over the next few days, and Ms. Halligan, again

4

referring to her belief as to the evidence in the case, warned Ms. Bower: "Continue to do what you have been and you'll be completely discredited when the evidence comes out." (*Id.*).

Perhaps recognizing her exchanges with a journalist were improper, it was only on October 20, 2025, *after* Ms. Bower had reached out to DOJ's Office of Public Affairs that same day with a series of questions and for comment, that Ms. Halligan claimed—inaccurately, as the texts show—that everything she had previously written was "off the record," stating: "By the way – everything I ever sent you is off record." (*Id.* at 16). Ms. Bower politely responded, "I'm sorry, but that's not how this works. You don't get to say that in retrospect." (*Id.*). Ms. Halligan replied, "Yes I do. Off record" and repeated again, "It's obvious the whole convo is off record. There's disappearing messages and it's on signal. What is your story?" (*Id.*).

In initiating this contact, Ms. Halligan—the lead prosecutor on this case as of the date of this filing—commented on the credibility and general strength of the evidence presented to the grand jury. She also commented, more generally, on the purported strength of the case she was bringing, complained about the *New York Times*' coverage of a certain witness's grand jury testimony, and stated the article did not convey a "full representation" of what took place *before the grand jury*. These extrajudicial statements and prejudicial disclosures by any prosecutor, let alone one purporting to be the U.S. Attorney, run afoul of and violate the Federal Rules of Criminal Procedure, the Code of Federal Regulations, this Court's Local Rules, various rules of ethical and professional responsibility, and DOJ's Justice Manual.

Accordingly, in order to ensure a fair trial and impartial proceedings for Attorney General James, we respectfully seek the Court's intervention to prevent any further disclosures by government attorneys and agents of investigative and case materials, and statements to the media and public, concerning this case and any parties or witnesses.

# ARGUMENT

I. **Several Criminal Procedure, Local Court, and Ethical Rules Prohibit Extrajudicial Disclosures and Statements That Can Jeopardize a Defendant's Rights to a Fair Trial.**

Numerous federal statutes and rules, local rules, and codes of conduct govern the investigation and prosecution of criminal cases. Some of these rules address extrajudicial disclosures of information. Generally speaking, the purpose of these rules is to avoid prejudice to the defendant and to ensure a fair proceeding and trial. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1066 (1991).

A. **Federal Rule of Criminal Procedure 6(e)**

Rule 6(e) establishes a "General Rule of Secrecy" for grand jury matters that provides that certain persons, including government attorneys and investigators, "shall not disclose matters occurring before the grand jury," except under limited and discrete exceptions. Given the immense power of the government to investigate the conduct of private citizens (and public officials), Rule 6(e) creates clear, bright-line prohibitions to protect against the abuse of that power.[5] *See In Re Grand Jury Subpoena*, 920 F.2d 235, 241 (4th Cir. 1990). To that end, it prohibits disclosure of "anything that may reveal what has transpired before the grand jury" to protect "the freedom and integrity of the deliberative process." *See id.*, *accord In re Motions of Dow Jones & Co.*, 142 F.3d 496, 499–500 (D.C. Cir. 1998) ("[M]atters occurring before the grand jury" encompasses "what has occurred," "what is occurring," and "what is likely to occur."). Ms. Halligan's commentary

---

[5] The government can and does prosecute knowing violations of Rule 6(e) pursuant to district courts' contempt powers under 18 U.S.C. § 401(3), as well as pursuant to multiple felony criminal statutes. *See* Justice Manual, CRM 156 (observing that disclosure of "grand jury material with the intent to obstruct an ongoing investigation . . . may be prosecuted for obstruction of justice under 18 U.S.C. § 1503," and that an individual who "improperly disseminates grand jury materials may be prosecuted for the theft of government property under 18 U.S.C. § 641") (collecting cases).

6

on the evidence heard during grand jury proceedings—including whether grand jurors heard "exculpatory" evidence—violates this key protection.[6]

Courts recognize that the crime of leaking or disclosing such information by government agents sworn to uphold the law is often more egregious than the crimes those agents are charged with investigating. *See, e.g.*, *United States v. Walters*, 910 F.3d 11, 32 (2d Cir. 2018) (Jacobs, J., concurring) ("[T]he leak of grand jury testimony is in some respects more egregious than anything [Defendant] did [(insider trading)]—the FBI supervisor took an oath to uphold the law and was acting in a supervisory capacity to discharge an important public function."); *In re Blue Grand Jury*, 536 F. Supp. 3d 435, 437 (D. Minn. 2021) (in response to "apparent violation of Fed. R. Crim. P. 6(e) . . . order[ing] the United States to show cause why it is not in the interest of justice for this Court to appoint independent counsel to investigate and possibly prosecute criminal contempt charges relating to the apparent disclosures of matters occurring before the Blue Grand Jury"); *United States v. Smith*, 992 F. Supp. 743, 754–55 (D.N.J. 1998) (quoting *Finn v. Schiller*, 72 F.3d 1182, 1189 (4th Cir. 1996)) ("[C]ompromising grand jury secrecy is a serious matter. It can endanger the lives of witnesses and law enforcement officers and undermine the grand jury system. Courts must not tolerate violations of Rule 6(e) by anyone, especially United States Attorneys.").

### B. 28 C.F.R. § 50.2

Like the Federal Rules of Criminal Procedure, the Code of Federal Regulations (CFR) also has clear rules prohibiting DOJ prosecutors from improperly releasing extrajudicial statements or information. For example, Section 50.2(b), titled *Release of information by personnel of the Department of Justice relating to criminal and civil proceedings*, provides that, in criminal matters, "[a]t no time shall personnel of the Department of Justice furnish any statement or information for

---

[6] Attorney General James is not at this time formally moving for relief pursuant to FRCrP 6(e).

the purpose of influencing the outcome of a defendant's trial, nor shall personnel of the Department furnish any statement or information, which could reasonably be expected to be disseminated by means of public communication, *if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial*." 28 C.F.R. § 50.2(b)(2) (emphasis added). Critically, it continues, "[d]isclosures should include only incontrovertible, factual matters, *and should not include subjective observations*. *Id.* at § 50.2(b)(3) (emphasis added). In addition, where background information or information relating to the circumstances of an arrest or investigation would be highly prejudicial . . ., such information should not be made public." *Id.* (emphasis added). *See Patterson v. Colorado*, 205 U.S. 454, 462 (1907) ("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.").

These regulations also include limitations on the timing of any extrajudicial statements. For instance, "[b]ecause of the particular danger of prejudice resulting from statements *in the period approaching and during trial*, they ought strenuously to be avoided during that period. Any such statement or release shall be made only on the infrequent occasion when circumstances absolutely demand a disclosure of information and shall include only information which is clearly not prejudicial." 28 C.F.R. § 50.2(b)(5) (emphasis added). And because of the inherent dangers of prejudice to defendants, the CFR restricts DOJ personnel from making "(iv) Statements concerning the identity, testimony, *or credibility of prospective witnesses*" and "(v) Statements concerning *evidence or argument in the case*, whether or not it is anticipated that such evidence or argument will be used at trial." *Id.* at § 50.2(b)(6) (emphases added). The CFR does not have an exception for making such disclosures to the media "off the record."

### C. Local Rules for the U.S. District Court of the Eastern District of Virginia

This District takes very seriously its obligation to ensure a defendant's right to a fair trial by restricting and limiting extrajudicial statements and public commentary by counsel (and law enforcement personnel) involved in pending criminal or grand jury proceedings. It has reinforced those safeguards and limitations by enumerating them in the local rules.

For instance, Local Criminal Rule 57.1, *Free Press – Fair Trial Directives*, mandates that, in connection with any pending criminal case or proceeding, from the time of "the filing of a complaint, information, or indictment in any criminal matter until the termination of trial or disposition without trial, a lawyer . . . or law enforcement personnel associated with the prosecution . . . shall not release or authorize the release of *any extrajudicial statement* which a reasonable person would expect to be further disseminated by any means of public communication, if such statement concerns: . . . (4) The identity, testimony, *or credibility of prospective witnesses* . . . (6) Any opinion as to the accused's guilt or innocence or *as to the merits of the case or the evidence* in the case." Loc. Crim. R. 57.1(C) (emphases added). Additionally, with respect to grand jury proceedings or pending criminal investigations, "a lawyer participating in or associated with the investigation shall *refrain from making any extrajudicial statement* which a reasonable person would expect to be disseminated, by any means of public communication, that *goes beyond the public record or that is not necessary to inform the public* that the investigation is underway, to describe the general scope of the investigation . . . or otherwise to aid in the investigation." Loc. Crim. R. 57.1(B) (emphasis added). Local Rule 57.1(D) also prohibits prosecutors from releasing "any extrajudicial statement or interview relating to the trial or the parties or issues in the trial" if such a statement "will interfere with a fair trial." Loc. Crim. R. 57.1(D).

The Local Rules of this District make abundantly clear that a prosecutor's statement cannot be disseminated, revealed or disclosed if it would likely impair a defendant's right to a fair trial. Such care is critical to ensuring the constitutional right to impartial proceedings and a fair trial. Ms. Halligan, who made clear that she was "the one handling the case," started her exchange with Ms. Bower, telling the reporter what she "got wrong," just *two days* after Ms. Halligan signed the grand jury indictment.

D.     **Rules of Professional Responsibility**

The American Bar Association's (ABA) Model Rules of Professional Conduct also govern a prosecutor's heightened responsibility to refrain from prejudicing a defendant and to ensure a fair proceeding. Model Rule 3.8, *Special Responsibilities of a Prosecutor*, provides that "except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose," prosecutors shall "refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused."[7] Likewise, Model Rule 3.6, *Trial Publicity*, holds that "[a] lawyer who is participating or has participated *in the investigation or litigation* of a matter *shall not make an extrajudicial statement* that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."[8] (Emphases added). Virginia Rule of Professional Conduct 3.6 includes substantially the same prohibitions.[9] A federal prosecutor is not exempt from Rule 3.6's prohibition—certainly not one who is "handling the case."

---

[7] ABA Model Rules of Professional Conduct, Rule 3.8 (2023).
[8] ABA Model Rules of Professional Conduct, Rule 3.6 (2023).
[9] Virginia Rules of Professional Conduct (July 15, 2025).

### E. Department of Justice Manual

Finally, the Department of Justice has clear, decisive, and long-held rules prohibiting the exact types of extrajudicial statements and disclosures Ms. Halligan has made here.[10] Those rules of non-disclosure include contacts with a member of the news media and specifically limit disclosure of any potential grand jury matter. *See* Justice Manual (JM) 1-7.100 ("DOJ personnel should presume that non-public, sensitive information obtained in connection with work is protected from disclosure, with few exceptions"); JM 1-7.210 ("DOJ personnel must report . . . any contact with a member of the media about a DOJ matter. . . . If the contact concerns suspected classified or *grand jury subject matter*, DOJ personnel must immediately notify a supervisor.") (emphasis added); JM 1-7.310 (requiring United States Attorneys to coordinate their news media contacts with DOJ's Office of Public Affairs (OPA) in cases that "are of national importance"); JM 1-7.400 (prohibiting public disclosure of information concerning ongoing criminal investigations); JM 1-7.600 (non-disclosure rule prohibiting DOJ personnel from making any statement or disclosing any information "that reasonably could have a substantial likelihood of materially prejudicing an adjudicative proceeding"); JM 1-7.610 (limiting public disclosure of information by DOJ personnel over similar concerns of prejudice).

### II. Ms. Halligan's Extrajudicial Disclosures and Statements Jeopardize the Right to a Fair Trial, and are Barred by Federal, Local, and Ethical Rules.[11]

"Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that

---

[10] DOJ Justice Manual (last visited Oct. 21, 2025), https://perma.cc/TC49-R3LY.

[11] In addition to apparently violating the rules addressed in this section, Ms. Halligan admitted in her exchanges with the journalist to a likely violation of the federal records laws and rules around using unapproved electronic messaging accounts. *See* 44 U.S.C. § 2911 (restricting officer or employee of an executive agency from sending messages using a non-official electronic messaging account). Ms. Halligan acknowledged she was using an unofficial messaging application, Signal,

fundamental right." *Gentile*, 501 U.S. at 1075. For this reason, numerous federal and local rules and codes of conduct govern extrajudicial disclosures of information in the investigation and prosecution of criminal cases.

Ms. Halligan's initiation of contact, and then repeated exchanges, with the journalist—a mere *two days* after filing charges—appear to have violated several of the above-cited rules and codes of professional conduct. As the purported chief law enforcement officer for this District, as well as the individual who alone presented evidence to the grand jury in Alexandria and signed the two-count indictment of Attorney General James,[12] Ms. Halligan should know that she is prohibited by the federal, local, and Department rules governing extrajudicial statements and media contacts from engaging with a journalist about the substance and merits of a charged criminal case and the purported strength of the evidence put before a grand jury. The constitutional right to a fair trial *and* the secrecy of grand jury proceedings are sacred principles of our criminal justice system. *See Estes v. Texas*, 381 U.S. 532, 540 (1965) (the right to a fair trial is "the most fundamental of all freedoms"); *Finn v. Schiller*, 72 F.3d 1182, 1189 (4th Cir. 1996) (compromising grand jury secrecy "can endanger the lives of witnesses and law enforcement officers and undermine the grand jury system"). Here, neither principle was upheld in Ms. Halligan's pretrial interactions with the journalist.

---

with its "disappearing messages" feature enabled and set to automatically delete after eight hours. Trying to delete the paper trail of improper communications does not mean they did not occur. For this reason, Attorney General James also asks the Court to order government attorneys and agents involved in this case to follow relevant laws around records retention, and to impose a litigation hold preventing the deletion or destruction of any records or communications having anything to do with the investigation and prosecution of this case. Attorney General James will pursue this apparent violation of the law with the appropriate offices.

[12] Carol Leonnig, et al., *Grand Jury Indicts New York Attorney General Letitia James*, MSNBC (Oct. 9, 2025), https://perma.cc/K7JL-NQY7.

*First*, in violation of Federal Rule of Criminal Procedure 6(e), Ms. Halligan commented on "exculpatory evidence" that would, as reported in several outlets, undercut the charges against Attorney General James. She then commented on the credibility and general strength of the evidence presented to the grand jury, stating the *New York Times* reporters "did [get something wrong] but you went with it!", in reference to Ms. Bower reposting the reporting on *X*, and also stated that "they are disclosing grand jury info – which is also not a full representation of what happened," attempting to refute the *New York Times*' account of a certain witness's grand jury testimony. Ms. Halligan also referenced possible trial evidence (cited in the indictment) to drive home her point when she stated, "It says she received thousand(s) of dollars in rent." As with the leaks that occurred before the charges in this case were filed,[13] subjective observations and comments about evidence clearly derived from grand jury presentations violate Rule 6(e), which requires government attorneys to refrain from "disclos[ing] matters occurring before the grand jury," except under limited exceptions not present here.

*Second*, Ms. Halligan ran roughshod over the protections afforded by 28 C.F.R. § 50.2 when she initiated contact with a journalist to affect the reporting on the case she had just brought. Ms. Halligan's statements, including "you don't have sources that are accurately telling you" certain material; "Yes they did [get something wrong] but you went with it!"; claiming the *New York Times*' account of grand jury activity is "not a full representation of what happened"; and claiming that the defendant "received thousand(s) of dollars in rent," are extrajudicial and risk prejudicing the case. Worse, the disclosures made are not "incontrovertible, factual matters." They are the opposite: a prosecutor's subjective views, contested allegations, and disputed issues of fact. *See* 28 C.F.R. § 50.2(b)(2). As such, the extrajudicial statements concerning the pending case

---

[13] *See supra* at 2, n.2.

would violate numerous rules, regulations, and DOJ policies meant to protect the integrity of the grand jury and trial process.

*Third*, the Local Rules of this District specifically restrain prosecutors' extrajudicial disclosures where they would likely impair a defendant's right to a fair trial. In her messages with the journalist, Ms. Halligan appears to have violated Local Criminal Rule 57.1's prohibitions on extrajudicial discussions of "[t]he identity, testimony, or credibility of prospective witnesses" *and* "[a]ny opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case." Loc. Crim. R. 57.1(C). Ms. Halligan specifically addressed (and tried to refute) the testimony and credibility of a grand jury witness—whom the *New York Times* and the journalist referred to as Attorney General James' "great niece," or Ms. Thompson—when Ms. Halligan stated the *New York Times* "did [get something wrong] but you went with it!" and claimed that the reporting was "not a full representation of what happened." When Ms. Bower asked Ms. Halligan what she was "getting wrong," Ms. Halligan stated, "Honestly, so much. I can't tell you everything but your reporting . . . is just way off."

Ms. Halligan's statements go beyond the public record or that which is necessary to inform the public that the investigation is underway, and mention trial-related issues which either were intended to or easily could "interfere with a fair trial." Loc. Crim. R. 57.1(B), (D). Continued extrajudicial statements about this case by government attorneys or law enforcement agents (even if they attempt to cloak them with "off the record" labels or seek to delete them after they are sent electronically) create a risk that they will be reported to the potential jury pool in this case. That risk is not hypothetical; pre-indictment articles already included leaked investigative information. *See Gentile*, 501 U.S. at 1075 (noting that the "interest in fair trials" is aimed at limiting "comments that are likely to prejudice the jury venire"); *see also United States v. Brown*, 218 F.3d 415, 428

(5th Cir. 2000) (upholding trial court order prohibiting counsel "from discussing with 'any public communications media' anything about the case 'which could interfere with a fair trial,' including statements 'intended to influence public opinion regarding the merits of this case'").

*Fourth*, for the reasons already stated, Ms. Halligan's extrajudicial statements fly in the face of the ABA's Model Rules of Professional Conduct governing the Special Responsibilities of a Prosecutor. There is no "legitimate law enforcement purpose" for the statements she made to Ms. Bower—either on *or* off the record—instead, they were intended to or could "have a substantial likelihood of heightening public condemnation of the accused." ABA Model R. 3.8. Ms. Halligan's statements also apparently violate Model Rule 3.6, *Trial Publicity*, which holds that "[a] lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." As the prosecutor who is "handling the case" against Attorney General James and purporting to be the U.S. Attorney, Ms. Halligan is supposed to be the standard-bearer of the professional responsibility rules rather than the District's violator-in-chief.

*Fifth and finally*, any plain reading of Ms. Halligan's comments—whether about "exculpatory evidence," the amount of rent Attorney General James allegedly received, grand jury witness testimony and credibility, reporters "getting it wrong," or her attempt to refute the *New York Times*' accuracy by apparent reference to the "full representation of what happened" in the grand jury—demonstrates that her messages run afoul of the Justice Manual's prohibitions on media contacts and grand jury sensitivity. *See* JM 1-7.100; JM 1-7.210; JM 1-7.310; JM 1-7.400; JM 1-7.600; JM 1-7.610. With its publication of the Justice Manual, the U.S. Department of Justice

15

set out clear, decisive rules for prosecutors prohibiting the exact types of extrajudicial statements and disclosures made here. No prosecutor is exempt from following those rules, but they should be followed to the letter by anyone trying to lead a prosecutor's office. Rather than follow DOJ's rules protecting non-public, sensitive information obtained in connection with a criminal case and investigation from disclosure, Ms. Halligan opted to use an encrypted app to text with a journalist and discuss the case, certain evidence, and her views on the strength of the charges brought, while ignoring any concerns of prejudice to the defendant, a fair trial, and rules against extrajudicial statements and pretrial publicity.

It has been reported that Ms. Halligan has no prosecutorial experience whatsoever. But all federal prosecutors are required to know and follow the rules governing their conduct from their first day on the job, and so any lack of experience cannot excuse their violation. While the oft-quoted phrase "the bell cannot be unrung" is true for that which has already occurred, the Court can require the government to follow the law going forward by entering Attorney General James' requested Order and preventing further disclosures of investigative and case materials, and of statements to the media and public, concerning this case and any parties or witnesses.

### III. An Order By This Court Would Protect Attorney General James' Right to a Fair Trial.

"[T]he measures a judge takes or fails to take to mitigate the effects of pretrial publicity . . . may well determine whether the defendant receives a trial consistent with the requirements of due process." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 555 (1976). Courts in similar high-profile cases have made every attempt to stem the tide of inflammatory extrajudicial comments made by officials in this administration to protect the rights of defendants, including orders that were still

disobeyed.[14] If they had not been reported by Ms. Bower, there is every likelihood that Mr. Halligan's extrajudicial statements to journalists to frame the case and its evidence as she liked would have continued, and there is no way yet to know what other statements she may have made to other reporters.

Proactive intervention by this Court is necessary to protect Attorney General James' constitutional rights and the integrity of this Court's procedures. An order by this Court requiring Ms. Halligan, and other DOJ employees and officials, to comply with the above-cited federal, local, Departmental, and ethical rules and regulations prohibiting prejudicial extrajudicial statements is the first step in providing such protection. *See Sheppard v. Maxwell*, 384 U.S. 333, 361 (1966) (finding that courts may restrict the communications of trial participants to protect the right to a fair trial without offending the First Amendment or the freedom of the press).

## CONCLUSION

For the foregoing reasons, Attorney General James respectfully requests that the Court issue an Order:

1. Prohibiting further government extrajudicial disclosures of investigative and case materials, and statements to the media and journalists, concerning this case and any parties or witnesses;

2. Requiring government counsel and agents in this case to obey all relevant federal laws and regulations regarding proper records retention, preserve all communications with any media person, journalist, or outlet, and take all reasonable steps to prevent the deletion or

---

[14] *See, e.g.*, *United States v. Abrego Garcia*, No. 3:25-cr-00115, ECF Nos. 69, 73, 101,118 (M.D. Tenn. Aug. 28, 2025).

destruction of any records or communications having anything to do with the investigation and prosecution of this case; and

      3.     Directing government counsel to create and maintain a log of all contact between any government attorney or agent on this case and any member of the news media or press concerning this case.

A Proposed Order is attached.

Dated: October 23, 2025

Respectfully submitted,

*/s/ Abbe David Lowell*
Abbe David Lowell (*admitted pro hac vice*)
David A. Kolansky (*admitted pro hac vice*)
Isabella M. Oishi (*admitted pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005
Tel: 202-964-6110
Fax: 202-964-6116
ALowellpublicoutreach@lowellandassociates.com
DKolansky@lowellandassociates.com
IOishi@lowellandassociates.com

*/s/ Andrew Bosse*
Andrew Bosse (VSB No. 98616)
BAUGHMAN KROUP BOSSE PLLC
500 E. Main Street, Suite 1400
Norfolk, VA 23510
Tel: (757) 916-5771
ABosse@bkbfirm.com

*Attorneys for Letitia A. James*