## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

FILED

NOV − 7 2025

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        v.                          )        Case No.: 2:25-CR-00122-JKW-DEM
                                    )
LETITIA A. JAMES,                   )
                                    )
            Defendant.              )
                                    )
```

### BRIEF OF BIPARTISAN FORMER FEDERAL JUDGES AND FORMER UNITED STATES ATTORNEYS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT'S REQUEST FOR RELIEF

Justin P. Keating (VA Bar 75880)
Treyvon D. Jordan (VA Bar 101153)
BEINS, AXELROD & KEATING, P.C.
1800 Diagonal Rd., Suite 600
Alexandria, VA 22314
(703) 966-3193

Howard M. Cooper*
Benjamin J. Wish*
Joseph M. Cacace*
Josh L. Launer*
TODD & WELD LLP
One Federal Street
Boston, MA 02110
Tel: (617) 624-2626

*Counsel for Amici Curiae, Bipartisan Former Federal Judges and Former United States Attorneys*

*Pro Hac Vice Forthcoming*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

INTERESTS OF *AMICI CURIAE* ............................................................................4

BACKGROUND .........................................................................................................7

ARGUMENT ............................................................................................................10

   I.     THE CONSTITUTION DEMANDS, AND THE JUDICIARY RELIES UPON, THE
        DECISIONS OF INDEPENDENT PROSECUTORS TO ENSURE THE PROPER
        ADMINISTRATION OF JUSTICE ..........................................................................10

       A.  COURTS CANNOT DO JUSTICE WHERE CHARGING DECISIONS ARE
           BASED UPON POLITICAL OR PERSONAL MOTIVATIONS ........................10

       B.  THE CONSTITUTION AND COROLLARY STATUTORY REGIME ARE
           DESIGNED TO PREVENT POLITICAL AND PERSONAL BIAS FROM
           UNDERMINING THE PROPER ADMINISTRATION OF JUSTICE ...............13

   II.    THE APPARENT CIRCUMSTANCES SURROUNDING PRESIDENT TRUMP'S
        APPOINTMENT OF MS. HALLIGAN BETRAY THE POLITICAL AND
        PERSONAL CONSIDERATIONS BEHIND THE INDICTMENT OF
        ATTORNEY GENERAL JAMES, WHICH ARE ANTITHETICAL TO THE
        ADMINISTRATION OF JUSTICE ..........................................................................17

CONCLUSION...........................................................................................................20

CERTIFICATE OF SERVICE ...................................................................................22

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bowsher v. Synar,*
　　478 U.S. 714 (1986) ............................................................................14

*Edmond v. United States,*
　　520 U.S. 651 (1997) ............................................................................15

*Freytag v. Comm'r of Internal Rev.,*
　　501 U.S. 868 (1991). ...........................................................................15

*Granger v. Peyton,*
　　379 F.2d 709 (4th Cir. 1967) .................................................................3

*INS v. Chadha,*
　　462 U.S. 919 (1983) ............................................................................14

*N.L.R.B. v. Enter. Leasing Co. Se., LLC,*
　　722 F.3d 609 (4th Cir. 2013) ...............................................................15

*Rose v. Clark,*
　　478 U.S. 570 (1986) ............................................................................15

*Ryder v. United States,*
　　515 U.S. 177 (1995) ............................................................................15

*United States v. Chemical Foundation, Inc.,*
　　272 U.S. 1 (1926) .........................................................................14, 20

*United States v. Berger,*
　　295 U.S. 78 (1935) ..............................................................................20

*United States v. Giraud,*
　　No. 1:24-CR-00768, 2025 WL 2416737 (D.N.J. Aug. 21, 2025.........................9, 18

*United States v. Goodwin,*
　　457 U.S. 368 (1982) ............................................................................14

*United States v. Hasting,*
　　461 U.S. 499 (1983) ..............................................................................5

*United States v. Hilario,*
　　218 F.3d 19 (1st Cir. 2000) ..................................................................16

## TABLE OF AUTHORITIES
(Continued)

*United States v. Sotomayor Vazquez*,
  69 F. Supp. 2d 286 (D.P.R. 1999), *aff'd*, 249 F.3d 1 (1st Cir. 2001)....................................16, 19

*Vasquez v. Hillery*,
  474 U.S. 254 (1986) .................................................................................................................15

*Wright v. United States*,
  732 F.2d 1048 (2d Cir. 1984). .....................................................................................3, 16, 17

*Young v. United States ex rel. Vuitton et Fils S.A.*,
  481 U.S. 787 (1987) ............................................................................................................ Passim

**Constitution and Statutes**

U.S. Const., Article II, § 2 ...............................................................................................................14

U.S. Const., Article II, § 2 ...............................................................................................................13

28 U.S.C. § 541.................................................................................................................................16

28 U.S.C. § 546........................................................................................................7, 9, 16, 18, 19

28 U.S.C. § 546(d)........................................................................................................................5, 16

**Other Government Documents**

United States Dep't of Justice, *Justice Manual* § 9-27.260.................................................3, 12, 20

Griffin B. Bell, *An Address by the Honorable Griffin B. Bell, Attorney General of the United States, Delivered to Department of Justice Lawyers* (Sept. 6, 1978)..............................1, 12, 13

Robert H. Jackson, *"The Federal Prosecutor," An Address by Robert H. Jackson, Attorney General, Delivered at the Second Annual Conference of U.S. Attorneys* (Apr. 1, 1940) ......2, 10

Memorandum from Benjamin R. Civiletti, U.S. Att'y Gen., *Communication from the White House and Congress* (October 18, 1979).................................................................................13

Memorandum from Eric Holder, U.S. Att'y Gen., *Communication with the White House and Congress* (May 11, 2009).................................................................................................13

THE FEDERALIST No. 47 (James Madison) .............................................................................14, 19

THE FEDERALIST No. 51 (James Madison) .....................................................................................14

### TABLE OF AUTHORITIES
(Continued)

**Other Authorities**

Bruce Green & Rebecca Roiphe, *May Federal Prosecutors Take Direction From the President*,
    87 FORDHAM L. REV. 1817 (2019) .................................................................................. 11, 13

Bruce Green & Rebecca Roiphe, *Under Political Pressure: How Courts and Congress Can Help
    Prosecutors Seek Justice*, 135 YALE L.J. F. 138 (2025)............................................................20

Bruce Green & Ellen Yaroshefsky, *Prosecutorial Accountability 2.0*,
    92 NOTRE DAME L. REV. 51 (2016) ...........................................................................................11

*Criminal Justice Standards for the Prosecution Function, Standard 3-1.7(f) Conflicts of Interest
    (*AM. Bar Ass'n, 4th Ed., 2017*)* ..............................................................................................12

Caleb E. Nelson, *Must Administrative Officers Serve at the President's Pleasure?*, THE
    DEMOCRACY PROJECT (2025).....................................................................................................19


**News Reports and Other Media**

Katherine Faulders, *Trump Says He is Appointing Lindsey Halligan, One of His Former
    Attorneys, to Lead Key Prosecutor's Office*, ABC News (Sept. 20, 2025) ...........................8, 18

Katherine Faulders, et al., *Ex-special Counsel John Durham Undercuts Case Against James
    Comey in Interview with Prosecutors: Sources*, ABC News (Oct. 6, 2025)................................8

Glenn Thrush, et al., *Inside the Trump Administration's Push to Prosecute James Comey*, N.Y.
    Times (Sept. 27, 2025),..............................................................................................................8

Glenn Thrush, et al., *U.S. Attorney Investigating Two Trump Foes Departs Amid Pressure From
    President*, N.Y. Times (Sept. 19, 2025) .....................................................................................7

Alex Woodward, *White House Admits Trump's Message to Bondi to Prosecute Enemies Was
    Supposed to Be a DM: report*, Independent (Oct. 9, 2025)..........................................................9

## INTRODUCTION[1]

The Government's prosecution of New York Attorney General Letitia A. James in this case presents the precise danger to the rule of law which the Founders sought to eliminate in creating an independent judiciary. Amici are a bipartisan group of former United States federal judges and United States Attorneys who were appointed by both Republican and Democratic Presidents. Amici believe that, if the media reports surrounding the appointment of Lindsay Halligan as Interim United States Attorney for the Eastern District of Virginia and the indictment of Attorney General James are true, fundamental principles of law support the Defendant's request for dismissal of the indictment.

The courts cannot effectively administer justice without neutral prosecutors, free from political or personal influence: "[i]t is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987). To ensure confidence in our criminal justice system, "the Department [of Justice] must be recognized by all citizens as a neutral zone, in which neither favor nor pressure nor politics is permitted to influence the administration of the law." Griffin B. Bell, *An Address by the Honorable Griffin B. Bell, Attorney General of the United States, Delivered to Department of Justice Lawyers*, at 13 (Sept. 6, 1978), https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/09-06-1978b.pdf.

---

[1] No party or party's counsel authored this brief in whole or in part nor contributed money to fund preparation or submission of this brief. The government consented to the filing of this brief and therefore amici have filed an unopposed motion for leave to file this brief contemporaneously herewith.

Judges like the amici need to be able to rely upon prosecutors to exercise their expansive discretion based solely upon the consideration of justice, not private biases or, worse, the political motivations of the President. If the neutrality of prosecutors is undermined, or even appears to be undermined, the public will be unable to rely upon the courts to do justice, rather than to be used as a tool to carry out the political or personal whims of those who hold office. And individuals who are on the wrong side of the politics of the moment may be at grave risk of losing their liberty because of the caprice of a powerful political player.

It is for precisely these reasons that the Framers of the Constitution erected barriers to the President's ability to impose his intentions upon prosecutors. The Appointments clause ensures Congressional oversight of the President's selections. The Take Care clause demands that the President execute the laws "faithfully." And the separation of powers inherent in the structure of the Constitution ensures that the President cannot amass power by leveraging the courts to his political or personal ends.

Indeed, prosecutors wield immense power that can too easily be abused. "While the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base motives, he is one of the worst. ... Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted. ... ." Robert H. Jackson, *"The Federal Prosecutor" An Address by Robert H. Jackson, Attorney General, Delivered at the Second Annual Conference of U.S. Attorneys*, 1, 4-5 (Apr. 1, 1940), https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf. For exactly that reason, the Department of Justice Manual ("Justice Manual") forbids charging decisions predicated upon "[t]he attorney's own personal feelings concerning the person, the person's associates, or the victim," the "possible effect of the decision on the attorney's own

2

professional or personal circumstances," or "for the purpose of giving an advantage or disadvantage to any candidate or political party." U.S. Dep't of Justice, *Justice Manual* § 9-27.260, Principles of Federal Prosecution, Initiating and Declining Charges – Impermissible Considerations (2023).

The indictment of Attorney General James represents an assault upon these principles. It appears to be the product of the President's decision to pursue his political and personal goals of exacting revenge upon a perceived adversary, as he articulated in social media posts immediately preceding the attempt to appoint Lindsey Halligan as Interim U.S. Attorney, which led almost immediately to Attorney General James's indictment. As President Trump explained, he wanted Attorney General Pamela Bondi to appoint Ms. Halligan, his former personal attorney, because he believed her predecessor was a "woke RINO" who had done "[n]othing" about Attorney General James. Despite former U.S. Attorney for the Eastern District of Virginia Erik Seibert and other senior prosecutors and Justice Department officials finding no basis to bring criminal charges against Attorney General James, President Trump demanded that "JUSTICE MUST BE SERVED, NOW!!!" because "They impeached me twice, and indicted me (5 times!)." Donald J. Trump (@realDonaldTrump), Truth Social, (Sept. 20, 2025) 6:24pm EST ("President Trump September 20 Post"), https://truthsocial.com/@realDonaldTrump/posts/115239044548033727.

The President apparently had "an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." *Wright v. United States* 732 F.2d 1048, 1056 (2d Cir. 1984). While prosecutors generally enjoy wide discretion in charging decisions, courts must ensure that charging decisions are not based on improper considerations or that the prosecutor has "abdicated" her responsibility to make an independent charging decision. *See Granger v. Peyton,*

3

379 F.2d 709, 713 (4th Cir. 1967). Courts must also rigorously ensure compliance with the Appointments Clause, the primary structural protection the Framers enacted to protect against political prosecutions.

Political prosecutions have no place in the courts of the United States. Amici respectfully submit that the Administration's appointment of Lindsey Halligan as Interim United States Attorney for the Eastern District of Virginia violates the letter and the spirit of the separation of powers doctrine, the Take Care Clause, the Appointments Clause, and the statutes that codify the congressional authority described therein. That appointment and the indictment of Attorney General James that followed threaten to undermine the very character and function of the criminal justice system of the United States. Amici respectfully urge the Court to grant Defendant's request for relief.

**INTERESTS OF AMICI CURIAE**

Amici curiae are a bipartisan group of former United States federal judges and United States Attorneys who were appointed by presidents of both major political parties and who together devoted decades of their professional lives to the administration of the federal criminal justice system. They have collectively been responsible for overseeing and handling many thousands of federal criminal cases, and they have extensive knowledge about the appointment of federal court judges, United States Attorneys, and the responsibilities of federal prosecutors.

Model Code of Judicial Conduct: Canon 1 states that "[a] judge shall uphold and promote the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Federal district court judges retain oversight of grand jury proceedings to ensure their integrity, and they have a strong interest in ensuring that the prosecutors who administer those proceedings act in good faith in the pursuit of justice and not in service to

4

the animus of the President or others. *See United States v. Hasting*, 461 U.S. 499, 505 (1983) (describing the federal courts' supervisory power to, among other things, "preserve judicial integrity"). Moreover, under 28 U.S.C. § 546(d), where the period of an interim appointment expires, federal district judges are authorized to appoint a United States attorney to serve until the vacancy is filled. And in numerous ways federal court judges rely upon the impartiality of the prosecutors that appear before them so that they can carry out their purpose of the proper administration of the criminal justice system.

United States Attorney amici similarly have an interest in "the independence, integrity, and impartiality of the judiciary." If the media reports are true, and an indictment secured by a U.S. Attorney improperly appointed precisely to prosecute the President's personal and political agenda is permitted to stand, U.S. Attorneys and federal prosecutors will no longer be presumed to have acted in accordance with ethical and legal norms, and their actions will be second-guessed by judges. The jobs of both federal court judges and prosecutors will become exceedingly more difficult, and the result will be damage to the rule of law, the functioning of our judicial system, and, ultimately, the American people.

Amici have no stake in the outcome of the proceedings against Attorney General James, but they have a continuing interest in the fairness of the federal system for administering justice and carrying out the constitutional function of the judiciary. They also have a continuing and abiding interest in maintaining public confidence in that system. Put simply, amici believe that the system must be fair, and the public must have confidence in the fairness of the system. This requires that federal prosecutors make decisions without fear or favor, based entirely on the facts and the applicable law. Decisions about whether to bring federal criminal cases should not be

based on political considerations, and the decision-making process in individual cases should be free from political interference.

The former federal judges are:

- Chief Judge Ruben Castillo, U.S. District Judge, Northern District of Illinois (Ret.).

- Judge Morton Denlow, U.S. Magistrate Judge, Northern District of Illinois (Ret.).

- Judge David K. Duncan, U.S. Magistrate Judge, District of Arizona (Ret.).

- Judge Nancy Gertner, U.S. District Judge, District of Massachusetts (Ret.).

- Judge Steven M. Gold, U.S. Magistrate Judge, Eastern District of New York (Ret.).

- Judge A. Benjamin Goldgar, U.S. Bankruptcy Judge, Northern District of Illinois (Ret.).

- Judge Thelton Henderson, U.S. District Judge, Northern District of California (Ret.).

- Judge John E. Jones, III, U.S. District Judge, Middle District of Pennsylvania (Ret.).

- Judge J. Michael Luttig, U.S. Circuit Judge, U.S. Court of Appeals for the Fourth Circuit (Ret.).

- Judge Roanne L. Mann, U.S. Magistrate Judge, Eastern District of New York (Ret.).

- Judge John S. Martin, U.S. District Judge, Southern District of New York (Ret.).

- Judge A. Howard Matz, U.S. District Judge, Central District of California (Ret.).

- Judge Brian Owsley, U.S. Magistrate Judge, Southern District of Texas (Ret.).

- Judge Shira Scheindlin, U.S. District Judge, Southern District of New York (Ret.).

- Judge Fern M. Smith, U.S. District Judge, Northern District of California (Ret.).

The former United States Attorneys are:

- Harry Litman, U.S. Attorney for the Western District of Pennsylvania (1998-2001).

- Barbara McQuade, U.S. Attorney for the Eastern District of Michigan (2010-2017).

- William F. Weld, U.S. Attorney for the District of Massachusetts (1981-1986); Assistant U.S. Attorney General in charge of the Criminal Division (1986-1988); Governor of Massachusetts (1991-1997).

## BACKGROUND

In this case, the office of United States Attorney for the Eastern District of Virginia became vacant on January 20, 2025, when the Senate-confirmed incumbent, Jessica Aber, resigned. Thereafter, on January 21, Erik Siebert was appointed Interim United States Attorney. After Mr. Siebert served for the 120-day interim period authorized by 28 U.S.C. § 546, the judges of the district court appointed him to continue as Interim U.S. Attorney. Although the president nominated Mr. Siebert to the position of U.S. Attorney for the Eastern District of Virginia, he was never confirmed by the Senate, and he resigned on September 19, 2025.

The Amici do not know all the facts surrounding Mr. Siebert's departure, the subsequent appointment of Lindsey Halligan as United States Attorney, or the indictment of Attorney General James. However, if the myriad reports from the public press are accurate, the events provide a case study on the reasons why the president should not enjoy the unchecked power to appoint a United States Attorney who will do his bidding or interfere in the independent decisions of prosecutors on whether or not to bring criminal charges against an individual.

Facts indicated in public reporting include the following: Mr. Siebert resigned after being pressured by the president to indict persons, including Attorney General James, whom the president regarded as political enemies. *See* Glenn Thrush, et al., *U.S. Attorney Investigating Two Trump Foes Departs Amid Pressure From President*, N.Y. Times (Sept. 19, 2025),

7

https://www.nytimes.com/ 2025/09/19/us/politics/erik-siebert-comey-letitia-james.html. Neither Mr. Siebert nor his senior staff, nor reportedly Deputy Attorney General Todd Blanche, believed there was a viable criminal case against Attorney General James, and they made their views known to the DOJ and to the president. *See id.*; Katherine Faulders, et al., *Ex-special Counsel John Durham Undercuts Case Against James Comey in Interview with Prosecutors: Sources*, ABC News (Oct. 6, 2025) ("Durham Undercuts Case Against James Comey"), https://abcnews.go.com/ US/special-counsel-john-durham-undercut-case-james-comey/story?id=126164120; Glenn Thrush, et al., *Inside the Trump Administration's Push to Prosecute James Comey*, N.Y. Times (Sept. 27, 2025), https://www.nytimes.com/2025/09/27/us/politics/trump-comey-justice-department.html.

On September 20, 2025, the day after Mr. Seibert resigned, President Trump announced he was nominating Lindsey Halligan—his former personal attorney—to be United States Attorney for the Eastern District of Virginia. He posted on Truth Social that what was needed was a "tough prosecutor," not a:

> Democrat Endorsed 'Republican.' I will be nominating Lindsey Halligan to be the United States Attorney in this very important part of our Great Country. She will be Fair, Smart, and will provide, desperately needed, JUSTICE FOR ALL!

*See*, Katherine Faulders, *Trump Says He is Appointing Lindsey Halligan, One of His Former Attorneys, to Lead Key Prosecutor's Office*, ABC News (Sept. 20, 2025) ("Trump Says He Is Appointing Lindsey Halligan"), https://abcnews.go.com/Politics/trump-nominate-former-attorney-lead-key-prosecutors-office/story?id=125775601.

Later that same day, President Trump publicly posted a statement on Truth Social, directed to Attorney General Pamela Bondi, urging the appointment of Lindsay Halligan and the prosecution of, among others, Attorney General James:

Pam: I have reviewed over 30 statements and posts saying that, essentially, "same old story as last time, all talk, no action. Nothing is being done. What about Comey, Adam "Shifty" Schiff, Leticia??? They're all guilty as hell, but nothing is going to be done." Then we almost put in a Democrat supported U.S. Attorney, in Virginia, with a really bad Republican past. A Woke RINO, who was never going to do his job. That's why two of the worst Dem Senators PUSHED him so hard. He even lied to the media and said he quit, and that we had no case. No, I fired him, and there is a GREAT CASE, and many lawyers, and legal pundits, say so. Lindsey Halligan is a really good lawyer, and likes you, a lot. We can't delay any longer, it's killing our reputation and credibility. They impeached me twice, and indicted me (5 times!), OVER NOTHING. JUSTICE MUST BE SERVED, NOW!!! President DJT.

President Trump September 20 Post.[2]

Two days later, Attorney General Bondi purported to swear in Ms. Halligan as the Interim U.S. Attorney for the Eastern District of Virginia under 28 U.S.C. § 546. Ms. Halligan had no prior experience as a federal prosecutor. She had been a member of President Trump's personal legal team and then served as Senior Associate Staff Secretary/Special Assistant to the President in the White House in 2025.

As of September 22, 2025, more than 120 days had expired since the departure of a Senate-confirmed US Attorney for the Eastern District of Virginia. The governing statute, 28 U.S.C. § 546, authorizes the Attorney General to appoint a United States Attorney during the initial 120 vacancy period, but not thereafter. The statute does not permit the executive branch to make repeated appointments after the expiration of 120 days. *See United States v. Giraud*, No. 1:24-CR-00768, 2025 WL 2416737, at *2 (D.N.J. Aug. 21, 2025).

---

[2] Equally unsettling is that President Trump intended to apply pressure on Attorney General Bondi privately. He did not want this message to see the light of day and believed he had sent this message to the Attorney General privately. *See* Alex Woodward, *White House Admits Trump's Message to Bondi to Prosecute Enemies Was Supposed to Be a DM: report*, Independent (Oct. 9, 2025), https://www.yahoo.com/news/articles/white-house-admits-trump-message-155951720.html.

On October 9, 2025, Ms. Halligan alone obtained the pending two-count indictment of Attorney General James from a federal grand jury in the Eastern District of Virginia.

## ARGUMENT

I.     **The Constitution Demands, and the Judiciary Relies Upon, the Decisions of Independent Prosecutors to Ensure the Proper Administration of Justice.**

    A.     **Courts Cannot Do Justice Where Charging Decisions Are Based Upon Political or Personal Motivations.**

The independence of prosecutors who act in good faith to do justice is a cornerstone of the criminal justice system. "The prosecutor has more control over life, liberty, and reputation than any other person in America. ... While the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base motives, he is one of the worst." Robert H. Jackson, *The Federal Prosecutor*, 1 (1940).

Judges like the amici rely upon the good faith and neutrality of prosecutors. If prosecutors are beholden to the Executive or, indeed, to any individual, the public faith in the courts to do justice impartially and in prosecutors to enforce the laws without fear or favor will be shattered: "It is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters." *Young*, 481 U.S. 787, at 810 (1987); *see also id.* at 814 (explaining that "[e]ven if a defendant is ultimately acquitted, forced immersion in criminal investigation and adjudication is a wrenching disruption of everyday life," so courts must ensure that "those who would wield this power will be guided solely by their sense of public responsibility for the attainment of justice"). For example, judges necessarily depend upon the representations that prosecutors make to the courts regarding the prosecutors' expectations of what they believe a fair resolution of a criminal matter may be. If the biases of the President or others muddy prosecutors' motives, judges like amici will be unable

to rely upon such representations when assessing whether to accept a plea bargain. Similarly, in determining whether to accept guilty pleas based upon the prosecutors' proffer of the facts they expect to prove at trial, judges like amici will struggle to discern whether that account is influenced by the desires of the President or others. And to protect the independence of grand juries, judges depend on professional prosecutors to pursue "indictments for legitimate reasons, not partisan purposes or personal gain." Bruce Green & Rebecca Roiphe, *May Federal Prosecutors Take Direction From the President*, 87 FORDHAM L. REV. 1817, 1851 (2019). "If prosecutors are subject to presidential control and … are no longer making discretionary decisions according to professional norms, one of the premises of judicial restraint in the exercise of its supervisory power [over grand juries] will be lacking." *Id.* This would upend any presumption of regularity typically given to grand jury proceedings. "If courts cannot rely on prosecutors to make decisions in a disinterested manner, then they are compromised in their ability to interpret the law and apply it to the facts," *id.*, without regularly engaging in searching inquiries of the motives of prosecutors who appear before them.

If the President resolves to disregard the guardrails that the Constitution and separation of powers doctrine have established by installing prosecutors who are selected for their loyalty and willingness to abide by the President's direct commands, he undermines the very independence of the judiciary by seeking to transform it into a tool to accomplish his own ends. Indeed, "[a]llowing a president to control prosecutors threatens to undermine the judiciary, not just by stripping it of the ability to impose ethics rules on lawyers, but also by impeding it in performing its core function of determining the facts and applying the law in individual criminal cases." Bruce Green & Ellen Yaroshefsky, *Prosecutorial Accountability 2.0*, 92 NOTRE DAME L. REV. 51, 55-56 (2016) (describing courts' traditional reliance on prosecutorial integrity). Justice cannot be done where

11

neither the jurists, the accused, nor the public can trust that prosecutors' charging decisions are based upon their good faith exercise of discretion and not political caprice.

The Justice Manual also makes plain that in considering whether to initiate charges, the determination must be sanitized of any animus, ill will, personal feelings, or any political motivation whatsoever. It provides that the "Impermissible Considerations" in making charging decisions include "[t]he attorney's own personal feelings concerning the person, person's associates, or the victim," the "possible effect of the decision on the attorney's own professional or personal circumstances," or "for the purpose of giving an advantage or disadvantage to any candidate or political party." U.S. Dep't of Justice, *Justice Manual* § 9-27.260, Principles of Federal Prosecution, Initiating and Declining Charges – Impermissible Considerations (2023). In the same way, the Criminal Justice Standards for the Prosecution Function spell out the strict prohibition against any conflict of interest that may impact a prosecutor's decisions: "The prosecutor should not permit the prosecutor's professional judgement or obligations to be affected by the prosecutor's personal, political, financial, professional, business, property, or other interests of relationships. A prosecutor should not allow interests in personal advancement or aggrandizement to affect judgments regarding what is in the best interests of justice in any case." CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION, Standard 3-1.7(f) – Conflicts of Interest (AM. BAR ASS'N, 4th Ed., 2017).

Consonant with those bedrock principles, U.S. Attorneys General have consistently expressed the conspicuous danger that the influence of politics poses to the operation of the judicial system. For example, Attorney General Griffin Bell remarked: "[T]he Department of Justice is the acknowledged guardian and keeper of the law. It follows necessarily that the Department must be recognized by all citizens as a neutral zone, in which neither favor nor pressure nor politics is

permitted to influence the administration of the law." Griffin B. Bell, *An Address by the Honorable Griffin B. Bell,* at 13 (1978). In the same way, Attorney General Benjamin R. Civiletti explained that prosecutors "must be insulated from influences" other than doing justice. Memorandum from Benjamin R. Civiletti, U.S. Att'y Gen., *Communication from the White House and Congress* (October 18, 1979). More recently, Attorney General Eric Holder expressed: "The legal judgments of the Department of Justice must be impartial and insulated from political influence. It is imperative that the Department's investigatory and prosecutorial powers be exercised free from partisan considerations." Memorandum from Eric Holder, U.S. Att'y Gen., *Communication with the White House and Congress* (May 11, 2009).

The proper functioning of the courts in criminal cases depends, in large measure, on the good faith administration of the laws, without fear or favor, based upon the facts and the law, and the exercise of professional judgment—and not malice or political vendettas. "[A]n independent judiciary depends on independent prosecutors to bring appropriate cases, decline to bring inappropriate ones, and ensure a level of truth and fairness in the judicial process." Bruce Green & Rebecca Roiphe, *May Federal Prosecutors Take Direction From the President, supra* at 1821. "Prosecutors beholden to the president would be impeded in carrying out this function and the judiciary itself would be hobbled." *Id.*

### B. The Constitution and Corollary Statutory Regime Are Designed to Prevent Political and Personal Bias from Undermining the Proper Administration of Justice.

The Constitution guards against the risk that the President or others may seek to undermine the neutrality of prosecutors. The Framers entrusted to the Executive Branch, and particularly to the President, the stewardship of the laws of the United States. Article II of the U.S. Constitution requires that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art.

II, § 3. That provision creates a duty, not a power: federal prosecutors enjoy "broad discretion" to enforce the criminal laws, *United States v. Goodwin*, 457 U.S. 368, 380, n. 11 (1982), exactly because the Take Care clause creates a "presumption of regularity," *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15 (1926), that the laws will be executed "faithfully." For that reason, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15 (1926).

The duty of the President to ensure "regularity" and the "proper[] discharge[]" of prosecutors' responsibilities is buttressed by the separation of powers that is fundamental to the structure of the Constitution. The Framers designed the Constitution with an explicit goal of diluting the ability of any one branch of government to arrogate power to itself and undermine the powers of the other branches: they "recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty," and so divided governmental power in order to blunt it. *Bowsher v. Synar*, 478 U.S. 714, 730 (1986). By so doing, they enabled "[a]mbition ... to counteract ambition" at every turn. THE FEDERALIST NO. 51 (James Madison). They believed that the powers of government must be separated among the branches because: "[t]he accumulation of all powers ... may justly be pronounced the very definition of tyranny." THE FEDERALIST NO. 47 (James Madison). The Framers thus divided the "powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial." *INS v. Chadha*, 462 U.S. 919, 951 (1983).

One crucial means by which the Framers blunted the power of the Executive was through the Appointments Clause, which requires that the President submit nominations for "principal" and "inferior" officers for the "Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2.

*See generally Edmond v. United States*, 520 U.S. 651, 658–666 (1997). The intent and effect of that clause has been to ensure a "shared responsibility between the President and the Senate" concerning senior executive branch officials, which acts "as a 'check upon a spirit of favoritism in the President,'" and "prevent[s] the appointment of 'unfit characters.'" *N.L.R.B. v. Enter. Leasing Co. Se., LLC*, 722 F.3d 609, 633 (4th Cir. 2013) (quoting THE FEDERALIST NO. 76 (Alexander Hamilton)). "The [Appointments] Clause is a bulwark against one branch aggrandizing its power at the expense of another branch," *Ryder v. United States*, 515 U.S. 177, 182 (1995), and "it is among the significant structural safeguards of the constitutional scheme," *Edmond*, 520 U.S. at 659. "The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic." *Freytag v. Comm'r of Internal Rev.*, 501 U.S. 868, 880 (1991).

The Appointments Clause affords the legislature the opportunity to evaluate and reject the President's selection of a United States Attorney who may be beholden to the President, or otherwise unfit to hold the office. Indeed, the Supreme Court has recognized that the "appointment of an interested prosecutor" may be a "fundamental" error that "undermines confidence in the integrity of the criminal proceeding." *Young*, 481 U.S. at 810 (1987), citing *Rose v. Clark*, 478 U.S. 570, 577–578 (1986) (reversing conviction based on appearance that appointed prosecutor may have been motivated by external considerations). Such an appointment of someone with "conflicting loyalties" indeed "'calls into question the objectivity of those charged with bringing a defendant to judgment.'" *Id.* (quoting *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986)).

Likewise, the statutes governing the appointment of United States Attorneys and Interim United States Attorneys expressly provide a role for the Senate (through advice and consent) and the judiciary (for interim appointments after the expiration of 120 days), as critical checks on the

president's law enforcement power. *See* 28 U.S.C. §§ 541 & 546. If 120 days expire and no nominee for United States Attorney has obtained the Senate's approval, § 546(d) vests authority to appoint an Interim U.S. Attorney in the federal courts, and particularly in the judges of the trial courts like amici. *See generally United States v. Sotomayor Vazquez*, 69 F. Supp. 2d 286, 295 (D.P.R. 1999), *aff'd*, 249 F.3d 1 (1st Cir. 2001) (discussing Appointments Clause and history of U.S. Attorney appointments); *United States v. Hilario*, 218 F.3d 19, 26 (1st Cir. 2000) ("Congress chose to place the appointing power vis-à-vis interim United States Attorneys partially in the judiciary.").

Those statutes, along with the Appointments Clause, are consistent with the fundamental principle that the president does not have unlimited power to direct criminal prosecutions as he wishes. Rather, he has a duty to ensure that the laws are "faithfully" executed—by properly qualified, professional, and apolitical prosecutors—and the other two branches have a role to play in ensuring the president does so.

There is no litmus test to assess whether the President's influence has polluted the neutrality of a prosecutor such that it amounts to a violation of the principles and demands of the Constitution. As the Second Circuit recognized in *Wright v. United States*, a prosecutor has forfeited her neutrality where she "has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." 732 F.2d 1048, 1056 (2d Cir. 1984). The necessarily disinterested disposition of a prosecutor does not permit "conflicting loyalties" which amount to "factors that threaten to compromise the performance of [the prosecutors'] duty." *Young*, 481 U.S. at 810 (1987).

16

**II.    The Apparent Circumstances Surrounding President Trump's Appointment of Ms. Halligan Betray the Political and Personal Considerations Behind the Indictment of Attorney General James, Which Are Antithetical to the Administration of Justice.**

The publicly reported facts surrounding President Trump's appointment of Ms. Halligan indicate that the President impermissibly sought to inject political and personal considerations into the charging decision at issue here. The indictment against Attorney General James appears to be the product of the very definition of an interested prosecutor:

> It is a bit easier to say what a disinterested prosecutor is not than what he is. He is not disinterested if he has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged.

*Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984).

President Trump made quite clear that he had "an axe to grind against" Attorney General James in his public message to Attorney General Bondi. His view appears to be that "justice" means revenge, by subjecting his perceived enemies, including Attorney General James, to criminal prosecutions solely because Mr. Trump himself was investigated and prosecuted: "They impeached me twice, and indicted me (5 times!), OVER NOTHING. JUSTICE MUST BE SERVED, NOW!!!" President Trump September 20 Post.

President Trump apparently relied upon the social media posts of unnamed persons and legal pundits who had no access to the evidence to determine whether there was enough evidence to prosecute Attorney General James, stating: "I have reviewed over 30 statements and posts saying that, essentially, 'same old story as last time, all talk, no action. Nothing is being done here. What about Comey, Adam 'Shifty' Schiff, Leticia??? … [T]here is a GREAT CASE, and many lawyers, and legal pundits, say so." *Id.* To the extent his political motivations were unclear, President Trump made the political character of his demand clear by immediately pivoting to

17

criticize a U.S. Attorney based upon his characterization of their political leanings, calling him a "Woke RINO."[3] *Id.*

Immediately thereafter, President Trump nominated and directed Attorney General Bondi to appoint Ms. Halligan with the apparent goal of her fulfilling his wishes. As Mr. Trump expressed in his September 20, 2025 post, he was frustrated that "[n]othing is being done" to Attorney General James. *Id.* Earlier that same day, he explained that he was nominating Ms. Halligan to be a U.S. Attorney for political reasons: "[w]hat we don't need is a Democrat Endorsed 'Republican.'" Faulders, *Trump Says He Is Appointing Lindsey Halligan*, ABC News (Sept. 20, 2025). He did so after former U.S. Attorney Seibert, the "Woke RINO," Deputy Attorney General Todd Blanche, and others reportedly found there was no viable criminal case against Attorney General James.

President Trump directed the appointment of Ms. Halligan after her predecessor, Mr. Siebert, had served on an interim basis for over 120 days, the maximum time allotted under 28 U.S.C. § 546. The clock does not reset with the appointment of Ms. Halligan, but rather there can only be an interim U.S. Attorney for an *aggregate* total of 120 days. This is apparent from the text of the statute itself, which provides that "the 120-day limit[] is benchmarked only to 'appointment by the Attorney General under this section,'" not to a *particular person's* appointment under the provision. *See United States v. Giraud*, No. 1:24-CR-00768, 2025 WL 2416737, at *10 (D.N.J. Aug. 21, 2025) (quoting 28 U.S.C. § 546(c)(2)). Ms. Halligan had previously acted as President Trump's personal attorney. Within weeks, she had executed upon President Trump's political and

---

[3] "RINO" is a common political epithet President Trump uses, meaning a "Republican In Name Only."

personal desires in the manner that the so-called "Woke RINO" and "Democrat Endorsed 'Republican'" had refused to do, by indicting Attorney General James.

By injecting that animus into the charging decision and ensuring that the Senate did not have the opportunity to scrutinize his selection, President Trump ran afoul of the Take Care and Appointments Clauses. There is nothing "regular" or "faithful" about a President (i) directing the appointment of his personal lawyer as a prosecutor; (ii) without Senate advice and consent, outside the 120-day limit prescribed by Section 546, and without affording the judges of the trial courts like amici their statutory right to appoint an interim U.S. Attorney, *see generally Sotomayor Vazquez*, 69 F. Supp. 2d at 295 (discussing Appointments Clause and history of U.S. Attorney appointments); (iii) tying that decision to his political motivations and the need to get "justice" on his perceived political enemies; and (iv) after other prosecutors had determined there was no viable basis to pursue a prosecution against Attorney General James. A prosecutor like Ms. Halligan cannot properly do her job in the face of "conflicting loyalties" which amount to "factors that threaten to compromise the performance of [the prosecutors'] duty." *Young*, 481 U.S. at 810 (1987).

If this Court allows the indictment against Attorney General James to proceed, it will ratify the President's decision to breach the barricades created by the structure of the Constitution itself, in order to amass excessive and inappropriate power. This indictment is an embodiment of the creeping "accumulation of all powers" which leads to tyranny. FEDERALIST No. 47 (James Madison). Indeed, "a President bent on vengeful, destructive, and lawless behavior can do lasting damage to our norms and institutions. As one member of Congress argued in 1789, we should not gravitate toward interpretations of the Constitution that 'legaliz[e] the full exertion of a tyrannical disposition.'" Caleb E. Nelson, *Must Administrative Officers Serve at the President's Pleasure?*,

THE DEMOCRACY PROJECT (2025), https://democracyproject.org/posts/must-administrative-officers-serve-at-the-presidents-pleasure. An indictment such as this, seemingly motivated by the personal and political desires of President Trump, and brought by a prosecutor apparently hand-picked to do so, is a large step towards the President improperly grasping the judiciary firmly as a hammer in order to stamp out his perceived political opponents.

Under such circumstances, courts cannot rely upon the good faith exercise of discretion of the prosecutor, unadulterated by motivations other than doing justice. Certainly the "proper[] discharge[]" of prosecutors' responsibilities, *Chemical Foundation, Inc.*, 272 U.S. at 14–15, does not include making a charging decision that directly contravenes the dictates of the Department of Justice Manual. Impermissibly, this indictment is the fruit of Ms. Halligan's "own professional or personal circumstances" and "for the purpose of giving an advantage or disadvantage to [a] candidate or political party." Justice Manual § 9-27.260, Principles of Federal Prosecution, Initiating and Declining Charges – Impermissible Considerations (2023). Ms. Halligan had an established personal and professional connection to President Trump and was enlisted explicitly, as documented through social media posts, not to do "justice," but rather to pursue retribution against President Trump's perceived political opponents.

## CONCLUSION

"As the Supreme Court observed ninety years ago, a federal prosecutor represents the United States, 'a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" Bruce Green & Rebecca Roiphe, *Under Political Pressure: How Courts and Congress Can Help Prosecutors Seek Justice*, 135 YALE L.J. F. 138 (2025) (quoting *United States v. Berger*, 295 U.S. 78, 88 (1935)), https://www.yalelawjournal.org/

forum/under-political-pressure-how-courts-and-congress-can-help-prosecutors-seek-justice.  "As lawyers for the United States, federal prosecutors must pursue justice for the American people—justice as defined by a fidelity to the law, courts, ethical obligations, and policies of the office, not as defined by the President." *Id.*

Amici respectfully submit that the Court should resolve the issues presented in this matter consistent with the principles of prosecutorial neutrality and grant Defendant's request for relief.

Respectfully submitted,

Justin P. Keating (VA Bar 75880)
Treyvon Jordan (VA Bar 101153)
BEINS, AXELROD & KEATING, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Tel: (703) 576-8238
jkeating@beinsaxelrod.com
tjordan@beinsaxelrod.com

Dated: <u>November 7, 2025</u>

Howard M. Cooper*
Benjamin J. Wish*
Joseph M. Cacace*
Josh L. Launer*
TODD & WELD LLP
One Federal Street
Boston, MA 02110
(617) 624-2626
hcooper@toddweld.com
bwish@toddweld.com
jcacace@toddweld.com
jlauner@toddweld.com

*Counsel for Amici Curiae, Bipartisan Former Federal Judges and Former United States Attorneys*

**Pro Hac Vice Forthcoming*

21

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2025, the foregoing motion was filed with the Clerk of the Court, and all other parties will be served through counsel.

Respectfully submitted,

Justin P. Keating (VA Bar 75880)
Treyvon D. Jordan (VA Bar 101153)
BEINS, AXELROD & KEATING, P.C.
1800 Diagonal Rd., Suite 600
Alexandria, VA 22314
(703) 966-3193
jkeating@beinsaxelrod.com
tjordan@beinsaxelrod.com


Howard M. Cooper*
Benjamin J. Wish*
Joseph M. Cacace*
Josh L. Launer*
TODD & WELD LLP
One Federal Street
Boston, MA 02110
(617) 624-2626
hcooper@toddweld.com
bwish@toddweld.com
jcacace@toddweld.com
jlauner@toddweld.com

*Pro Hac Vice Forthcoming

22